UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------

KEB HANA BANK, *as Trustee of LIME Chicago Office
Professional Investor's Private Real Estate Fund 3,*

                           Plaintiff,

        -v-

MS WACKER MANAGER LLC, SL WACKER
MANAGER LLC, 601 W SOUTH WACKER PROPERTY
MANAGER LLC, JOSEPH SKYDELL, MICHAEL
SILBERBERG, *and* MARK KARASICK,

                           Defendants.

-------------------------------------------------------------

25 Civ. 2059

OPINION & ORDER

**PAUL A. ENGELMAYER, District Judge:**

This is a contract dispute arising out of a real estate investment. Plaintiff KEB Hana Bank alleges that defendants MS Wacker Manager LLC, SL Wacker Manager LLC, 601 W South Wacker Property Manager LLC, Joseph Skydell, Michael Silberberg, and Mark Karasick failed to honor KEB's exercise of a put option pursuant to an agreement between the parties. KEB bring claims against all defendants for breach of contract, fraudulent misrepresentation, and promissory estoppel, and claims against some for breach of the implied covenant of good faith and fair dealing and breach of fiduciary duty.

Defendants move to dismiss all but one claim in KEB's Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court grants the motion.

1

I.    **Background**[1]

A.    **The Parties**

KEB Hana Bank ("KEB") is a business registered in the Republic of Korea.  Compl. ¶ 4.

It is the trustee of LIME Chicago Office Professional Investor's Private Real Estate Fund 3

("LIME"), a collective investment trust also registered in the Republic of Korea.  *Id.*  LIME is

managed by WellBridge Asset Management Co., Ltd., an asset management company.  *Id.*[2]

Salient here, KEB is an investor in 601 W South Wacker Member LLC (the "Company"), which

was founded for the sole purpose of owning a 100% interest in 601 W South Wacker Mezz LLC,

which holds a substantial interest in real property in Chicago, Illinois.[3]  *Id.* ¶ 18.

MS Wacker Manager LLC ("MS Wacker") is a limited liability company formed under

Delaware law and headquartered in New York.  *Id.* ¶ 5.  Its sole member is defendant Michael

Silberberg, a U.S. citizen and New York resident.  *Id.* ¶ 9.

SL Wacker Manager LLC ("SL Wacker") is a limited liability company formed under

Delaware law and headquartered in New York.  *Id.* ¶ 6.  Its sole member is defendant Mark

Karasick, a resident of New Jersey.  *Id.* ¶ 10.

---

[1] The Court draws the facts in this decision principally from the Complaint.  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  For purposes of resolving the motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the Complaint as true, drawing all reasonable inferences in KEB's favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

[2] The Court refers to KEB, LIME, and WellBridge collectively as "KEB."

[3] 601 W South Wacker Mezz LLC, in turn, is a Delaware limited liability company that holds an 81.1765% interest in fee title to the property located at One South Wacker Drive, Chicago, Illinois 60606, as a tenant-in-common with another Delaware limited liability company. Compl. ¶ 18.

MS Wacker and SL Wacker are the managing members of the Company (collectively, the "Managing Members"). *Id.* ¶ 15.

601 W South Wacker Property Manager LLC (the "Property Manager") is a limited liability company formed under Delaware law. *Id.* ¶ 7. The Property Manager is alleged to do business in Illinois or New York, and has two members: MS Wacker and SL Wacker. *Id.*

Joseph Skydell is a U.S. citizen and New York resident. *Id.* ¶ 8. He is alleged to be the managing member or controlling party of JS Wacker Investors LLC, a regular member of the Company. *Id.* ¶ 16.

### B.      The Agreements

On November 26, 2018, KEB made a capital contribution of $10 million to the Company. *Id.* ¶ 13. This gave KEB a 14.493% interest in the Company—the largest of any investor. *Id.* ¶ 14.

That same day, a limited liability company agreement was executed by the Managing Members and SL Wacker Special Member LLC. *Id.* ¶¶ 13, 15; Dkt. 1-1 (the "LLC Agreement"). Silberberg signed the agreement on behalf of MS Wacker; Karasick signed on behalf of SL Wacker and SL Wacker Special Member LLC. Compl. ¶ 15. Under the LLC Agreement, KEB became a regular member of the Company, and Jones Lang LaSalle was designated the Property Manager. *Id.* ¶ 13; LLC Agreement § 5.6(c).

Salient here, the LLC Agreement sets out the Managing Members' authority and obligations. It states that the Managing Members have a fiduciary duty to conduct the business and affairs of the Company "in the best interests of the Company and its [m]embers"; that "the execution and delivery of any document or instrument by the Managing Members shall be conclusive evidence" that those have been deemed appropriate by the Company; and that the

Managing Members are authorized to act on behalf of the Company.  Compl. ¶¶ 19–21; LLC Agreement §§ 5.4, 5.8.  The agreement also contains an exculpation clause, which insulates the Managing Members from liability, except "in instances where the liability, judgment or claim against the Managing Member is a direct result of its gross negligence, fraud or willful misconduct."  LLC Agreement § 14.15

Also on November 26, 2018, KEB entered into a separate agreement related to its investment in the Company.  Compl. ¶ 22; Dkt. 1-2 (the "Put Option Agreement").  That agreement was signed by Silberberg and Karasick on behalf of MS Wacker and SL Wacker, respectively.  It provides:

> The Investor's capital call obligation under Section 2.3 of the limited liability company agreement of the Company shall be limited to 25% of Investor's initial investment and Investor shall have a dilution rate of no greater than 1.25.
>
> After the fourth anniversary of its investment, the Investor may put its interest in the Company to 601 W South Wacker Property Manager LLC (the "Property Manger"), the property manager of the Property, at par.  The Property Manager can delay the closing for up to one year (to provide some flexibility with regard to the put, so that in the event market conditions are unfavorable at the fourth anniversary or for other reasons, a reasonable short term extension of one year will be provided to the Property Manager).

Compl. ¶ 23 (quoting Put Option Agreement).

C.    **Ensuing Communications**

On December 1, 2022, shortly after the fourth anniversary of KEB's investment, KEB sent an email to Skydell, who had been KEB's primary point of contact for the Company, stating that KEB intended to exercise the put option.  *Id.* ¶ 24.  KEB copied Karasick and Juliann Cunard—an employee of Jones Lang LaSalle.  *Id.*

4

On December 9, 2022, KEB sent a second notice of its intent to exercise the put option via email and courier to Skydell, Karasick, and Cunard. *Id.* ¶ 25. KEB did not receive any response. *Id.*

On May 8, 2023, KEB's representative traveled to New York to discuss the put option with the Company's representatives. *Id.* ¶ 26. At that meeting, Skydell acknowledged KEB's prior communications and intent to exercise the put. *Id.*

On May 19, 2023, Skydell, communicating on behalf of the Managing Members, issued a capital call, requesting KEB's contribution of 40% of its initial investment. *Id.* ¶ 27. On June 2 and 7, 2023, KEB sent Skydell emails stating that it declined to participate because the amount called was greater than the 25% limit set by the Put Option Agreement. *Id.* In those emails, KEB inquired about the status of the put. *Id.* KEB did not receive any response. *Id.*

On October 10, 2023, KEB sent an email to Skydell and Karasick inquiring about its interest in the Company in light of the recent capital call. *Id.* ¶ 28.

On October 12, 2023, Skydell issued another capital call, requesting KEB's contribution of 25% of its initial investment. *Id.* KEB again declined to participate. *Id.*

On December 8, 2023, KEB sent an email to Skydell and Karasick seeking confirmation of its put exercise. *Id.* ¶ 29. It noted that the deadline to close the put had been December 1, 2023, and stated, "We have repeatedly reminded and sought your confirmation of the [p]ut obligation since June 2, 2023, but have not received any response from anyone." *Id.*

On December 9, 2023, Skydell responded to KEB via email, with Karasick copied. *Id.* ¶ 30. He stated that, in accordance with the Put Option Agreement, the Property Manager "elects to adjourn the closing for one year." *Id.*

On December 14, 2023, Skydell wrote another email to KEB, copying Karasick and Eric Horowitz, who is a lawyer for defendants. *Id.* ¶ 31. Skydell stated that the Property Manager's right to delay the closing under the Put Option Agreement was measured from "the closing date," rather than—as KEB contended—the date that KEB exercised the put. *Id.*

On December 27, 2023, KEB requested a conference call to address the issues raised in Skydell's email, but did not receive any response. *Id.* ¶ 32.

On March 19, 2024, KEB sent an email to Skydell, Karasick, and Horowitz requesting a plan for the Property Manager's payment of the put, which it contended was due December 1, 2024. *Id.*

On October 16 and November 18, 2024, KEB sent further email reminders to Karasick and Skydell regarding the put, but received no response. *Id.* ¶ 33.

### D.    Procedural History

On March 12, 2025, KEB filed the Complaint. Dkt. 1. On May 22, 2025, defendants moved to dismiss. Dkt. 35 ("MTD"). On June 27, 2025, KEB opposed. Dkt. 38 ("Opp'n"). On July 16, 2025, defendants replied. Dkt. 39 ("Reply").

## II.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. For the purpose of resolving a motion to dismiss, the Court must

6

assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

For claims sounding in fraud, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard. Such claims must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a complaint must "allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Grp.*, Inc., 47 F.3d 47, 52 (2d Cir. 1995). Specifically, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292–93 (2d Cir. 2006) (citation omitted).

## III.    Discussion

Defendants move to dismiss all claims, except for the breach of contract claim against the Property Manager, under Rule 12(b)(6). [4]  For the following reasons, the Court grants the motion.[5]

---

[4] The parties agree that Delaware law governs this dispute.

[5] Defendants argue that the LLC Agreement's exculpation clause bars KEB's claims against all defendants except the Property Manager. *See* MTD at 11–13. KEB counters that the exculpation clause does not cover purported breaches of the Put Option Agreement, which is distinct from the LLC Agreement. Opp'n at 2–4. Because the Court dismisses the claims on other grounds, it does not resolve this dispute.

### A.    Individual Defendants

Defendants argue that all claims against the individual defendants—Silberberg, Karasick, and Skydell—fail because there is no legal basis to hold a member or principal of an LLC personally liable for the LLC's breach of contract or fiduciary duty.  MTD at 2–3.  KEB counters that this case warrants piercing the corporate veil because MS Wacker, SL Wacker, and the Property Manager were the alter egos of Silberberg, Karasick, and Skydell, respectively.  Opp'n at 9.  Defendants are correct.

"The shareholders of a corporation and the members of an LLC generally are not liable for the debts of the entity, and a plaintiff seeking to persuade a Delaware court to disregard the corporate structure faces 'a difficult task.'" *NetJets Aviation, Inc. v. LHC Commc'ns*, 537 F.3d 168, 176 (2d Cir. 2008) (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.,* 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989)).  "Nonetheless, in appropriate circumstances, the distinction between the entity and its owner 'may be disregarded' to require an owner to answer for the entity's debts." *Id.* (quoting *Pauley Petrol. Inc. v. Cont'l Oil Co.,* 239 A.2d 629, 633 (Del. 1968)).  "In general, with respect to the limited liability of owners of a corporation, Delaware law permits a court to pierce the corporate veil 'where there is fraud or where [the corporation] is in fact a mere instrumentality or alter ego of its owner.'" *Id.* (quoting *Geyer v. Ingersoll Pubs. Co.*, 621 A.2d 784, 793 (Del. Ch. 1992)).  Salient here, "[t]o prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness . . . [is] present.'" *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (quoting *Harper v. Del. Valley Broads., Inc.,* 743 F. Supp. 1076, 1085 (D. Del. 1990), *aff'd,* 932 F.2d 959 (3d Cir. 1991)).

The Complaint has alleged neither.

In assessing the "single economic entity" showing, courts consider the following factors:

> [W]hether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*Fletcher*, 68 F.3d at 1458 (quoting *Harco*, 1989 WL 110537, at *1). The Complaint does not allege that any such factor is present with respect to the LLCs here. It does not, for example, allege inadequate capitalization, insolvency, improper corporate recordkeeping, siphoning of corporate funds, or other impropriety. Nor does KEB argue as much in its opposition brief. Rather, KEB contends veil-piercing is appropriate merely because Silberberg is the sole member of MS Wacker; Karasick is the sole member of SL Wacker and the Property Manager; and Skydell responded to KEB's emails about the put option. Opp'n at 9. These allegations are insufficient to justify disregard of the corporate entity. *See, e.g.*, *eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *27 (Del. Ch. Sept. 30, 2013) ("Mere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity." (quoting *Skouras v. Admiralty Enters., Inc.*, 386 A.2d 674, 681 (Del. Ch. 1978))).

The second showing—"an overall element of injustice or unfairness"—does not require the plaintiff to prove "actual fraud," but "[t]he fraud or injustice to which a plaintiff points must be more than the underlying claim for which it seeks to hold the corporate owner liable." *Partner Reins. Co. Ltd. v. RPM Mortg., Inc.*, 604 F. Supp. 3d 121, 207 (S.D.N.Y. 2022) (citation omitted). The Complaint does not allege any fraudulent or unjust conduct apart from defendants' failure to honor KEB's exercise of the put option—the same conduct underlying

9

KEB's breach of contract and fraud claims.  Defending the Complaint, KEB argues that "[t]his is not a mere breach of contract but a deliberate act to hinder, delay or defraud an investor."  Opp'n at 10.  But such conclusory allegations, without more, fall far short of the required showing that the LLCs were "'used by those in control of [them] to perpetrate a fraud' or to 'promote injustice.'"  *NetJets Aviation, Inc.*, 537 F.3d at 177 (quoting *Sonne v. Sacks,* 1979 WL 178497, at *2 (Del. Ch. June 12, 1979))).

Because the allegations in the Complaint are insufficient to support KEB's veil-piercing theory, KEB is not entitled to that "extraordinary equitable remedy."  *Base Optics Inc. v. Liu*, 2015 WL 3491495, at *23 (Del. Ch. May 29, 2015).  The Court dismisses all claims against Skydell, Karasick, and Silberberg.  *See, e.g.*, *DG BF, LLC v. Ray*, 2021 WL 776742, at *27 (Del. Ch. Mar. 1, 2021) (dismissing claim against individual defendants where there were "no allegations that support an inference that [defendant LLC] is a sham or that it exists for no other purpose than as a vehicle for fraud" (citation omitted)); *MicroStrategy Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *12 (Del. Ch. Dec. 30, 2010) (complaint failed to plead claim to pierce corporate veil where it did not "allege any facts that Delaware courts traditionally rely upon for piercing the corporate veil"); *Banks v. Theodore Banks & S. Comfort, LLC*, 2022 WL 17261512, at *5 (Del. Ch. Nov. 29, 2022) (same where complaint "depict[ed] [defendant's] position as sole member of the LLC and wrongful acts by the LLC and [defendant]," but "those acts [were] not tied to the manipulation of the corporate form" (citation omitted)).

### B.      Breach of Contract

The Complaint alleges that defendants breached the Put Option Agreement by "failing to honor [KEB's] put exercise and failing to pay the money owed."  Compl. ¶ 39.  Defendants do not dispute that the Complaint states a claim for breach of contract as to the Property Manager.

MTD at 3–4 n.1. They argue, however, that the breach of contract claim against MS Wacker and SL Wacker fails because both signed the Put Option Agreement in a representative capacity, on behalf of the Company, and thus cannot be held liable for any alleged breach. *Id.* at 14–15.

It "is well established under Delaware law [that] signing an agreement in a representative capacity does not bind the signer in [its] personal capacity." *Baker v. Impact Holding, Inc.*, 2010 WL 1931032, at *3 (Del. Ch. May 13, 2010). In assessing whether an entity signed an agreement in a representative or personal capacity, courts consider factors such as whether: the signatory evinced an intent to bind itself individually, the agreement identified the individual on whose behalf the signatory was purportedly acting, or the agreement imposed obligations on the signatory. *See, e.g.*, *Huff Energy Fund, L.P. v. Gershen*, 2016 WL 5462958, at *7 (Del. Ch. Sept. 29, 2016); *GB-SP Holdings, LLC v. Walker*, 2024 WL 4799490, at *18 (Del. Ch. Nov. 15, 2024); *Miller v. Melson*, 1990 WL 96394, at *3 (Del. Super. Ct. June 20, 1990), *aff'd*, 582 A.2d 936 (Del. 1990).

The allegations in the Complaint support that MS Wacker and SL Wacker signed the Put Option Agreement as representatives of the Company.[6] First, the Managing Members had the authority to bind the Company under the LLC Agreement. *See, e.g.*, LLC Agreement § 5.8(a) ("each Managing Member is hereby appointed as an authorized representative of the Company," and "empowered to execute, deliver, and perform, in the name and on behalf of the Company" and to bind the Company to "any and all documents, instruments, agreements, affidavits and certificates of any kind or nature whatsoever"); *id.* § 5.8(b) ("the execution and delivery of any document or instrument by the Managing Members shall be conclusive evidence that the terms

---

[6] The allegations in the Complaint also suggest that the Managing Members might have signed the Put Option Agreement as representatives of the Property Manager, as MS Wacker and SL Wacker are alleged to be members of the Property Manager. *See* Compl. ¶ 7.

11

and conditions contained in the documents and instruments associated with the foregoing have been determined to be appropriate by the Company"). Second, the signature page of the Put Option Agreement lists SL Wacker and MS Wacker below the header, "The Managing Members," suggesting they were acting in their capacity as managing members of the Company. Put Option Agreement at 2. The Managing Members did not sign the agreement anywhere else. *Cf. Palermo v. JusLaw LLC*, No. 24 Civ. 8671, 2025 WL 2207874, at *8 (S.D.N.Y. Aug. 4, 2025) (finding, under Delaware law, personal liability of companies' chair who signed agreement twice, "once under the heading of [d]efendant [c]ompanies . . . and a second time with no reference" to the companies). Third, the Put Option Agreement imposes obligations only on the Property Manager. Put Option Agreement at 1. Accordingly, the Managing Members are not personally bound by the agreement and cannot be held liable for any purported breach thereof.

KEB counters that signatories to an agreement in a representative capacity can still be held liable for breaches of that agreement. The two cases it cites are inapposite. In *Addy v. Piedmonte*, the court found it plausibly alleged that defendant, who claimed to sign the agreement in a representative capacity, was a party to the agreement because the defendant "itself committed" to certain obligations thereunder. 2009 WL 707641, at *7 (Del. Ch. Mar. 18, 2009). The Put Option Agreement, in contrast, does not impose obligations on the Managing Members. *Kuroda v. SPJS Holdings, L.L.C.* is even further afield. 971 A.2d 872 (Del. Ch. 2009). There, the court denied dismissal of a breach of contract claim due to ambiguity in the agreement's exculpation clause. *Id.* at 880–83. That case thus did not consider the issue here—whether such a claim must be dismissed against individuals or entities who signed an agreement in a representative capacity.

Because the Managing Members signed the Put Option Agreement in a representative capacity, the Court dismisses the breach of contract claim against them. *See, e.g.*, *Huff Energy Fund, L.P.*, 2016 WL 5462958, at *7 (dismissing breach of contract claim against director defendants where it was "clear on the face of the document that they [signed] in a representative, not individual, capacity"); *Edge of the Woods, Ltd. P'ship v. Wilmington Sav. Fund Soc'y, FSB*, 2000 WL 305448, at *5 (Del. Super. Ct. Feb. 7, 2000) (dismissing claim against defendant who was "shielded from liability as the agent acting for a disclosed principal").

## C.    Fraud

The Complaint alleges two fraudulent misrepresentations, both by Skydell to KEB: that (1) the Property Manager would delay the closing of KEB's put for one year; and (2) the Put Option Agreement granted the Property Manager the right to delay the closing for one year from the closing date, rather than the put exercise date. Compl. ¶ 41.[7]

The Complaint does not state a claim for fraud against the Managing Members. To state a claim for fraud, a plaintiff must allege:

> (1) a false representation made by the defendant; (2) the defendant knew or believed the representation was false or was recklessly indifferent to its truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or refrained from acting in justifiable reliance on the representation; and (5) damage resulted from such reliance.

*Valley Joist BD Holdings, LLC v. EBSCO Indus., Inc.*, 269 A.3d 984, 988 (Del. 2021). The fraud claim is defective for several reasons. First, the Complaint does not allege that the Managing Members made or directed the purportedly fraudulent statements. It merely alleges, in a conclusory fashion, that Skydell "acted on behalf of" the Managing

---

[7] In its opposition, KEB appears to walk back the second allegation. *See* Opp'n at 13 ("To be clear, the Complaint does *not* plead that Skydell's interpretation of the Put Option Agreement was fraudulent." (emphasis in original)).

13

Members and other defendants. Compl. ¶¶ 16, 27. Second, it does not allege that the representations were false at the time made. KEB argues that their falsity is evidenced by the fact that the put "has not been paid to this date." Opp'n at 13. But "[a] party's failure to keep a promise does not prove the promise was false when made." *Grunstein v. Silva*, 2009 WL 4698541, at *13 (Del. Ch. Dec. 8, 2009) (quoting *Berdel, Inc. v. Berman Real Est. Mgmt., Inc.*, 1997 WL 793088, at *8 (Del. Ch. Dec. 15, 1997)). Third, the Complaint does not allege that the Managing Members knew or believed the representations to be false, or had the requisite intent with respect to the representations. It states only that "Skydell made these representations on behalf of all [d]efendants with full knowledge of their falsity and with an intent to deceive [KEB] regarding when the payment would be made." Compl. ¶ 43. Such bare allegations of knowledge and intent are insufficient to satisfy the heightened pleading standard of Rule 9(b). *See Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 208 (Del. Ch. 2006) ("[W]here pleading a claim of fraud has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pled facts from which it can reasonably be inferred that this 'something' was knowable and that the defendant was in a position to know it."), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007). Accordingly, the Court dismisses the fraud claim against the Managing Members. *See, e.g., Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *12 (Del. Ch. June 6, 2018) ("conclusory allegation that [defendants] knew the statements were false when made . . . [was] legally insufficient" to state fraud claim); *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 988–89 (Del. Ch. 2000) (dismissing fraud claim based on "conclusory allegation[s]").

The fraud claim against the Property Manager is not plausibly pled for a different reason: it duplicates the Complaint's breach of contract claim.[8] It is a "general rule of law that one cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations." *Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998). The Complaint's fraud claim is based on the same conduct underlying its breach of contract claim: the Property Manager's failure to honor KEB's exercise of the put. KEB argues that the claims are separate because they relate to actions at different points in time. *See* Opp'n at 15. But the allegations in the Complaint make clear that, at bottom, the claims are based on the same alleged misconduct—nonpayment of the put. *See* Compl. ¶ 39 (alleging breach of contract based on defendants' "fail[ure] to honor [KEB's] put exercise" and "pay the money owed"); *id.* ¶ 44 (alleging fraud based on defendants' "fail[ure] to honor the put option by their own alleged deadline"). And the Complaint seeks the same remedy for both claims: monetary damages of at least $10 million. *Id.* ¶¶ 39, 44. The Court therefore dismisses the fraud claim against the Property Manager. *See, e.g., BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, at *8 (Del. Ch. Aug. 3, 2004) (dismissing fraud claim where complaint sought to "[c]ouch[] an alleged failure to comply with" agreement as "a failure to disclose an intention to take certain actions arguably inconsistent with that agreement"); *Edinburgh Holdings, Inc.*, 2018 WL 2727542, at *11 (same where fraud claim was "based on the fact that [defendants] never intended to perform" under agreement).

---

[8] Because the Court has dismissed the breach of contract claims against the Managing Members, this ground for dismissal applies only to the claim against the Property Manager. *See Pilot Air Freight, LLC v. Manna Freight Sys., Inc.*, 2020 WL 5588671, at *26 (Del. Ch. Sept. 18, 2020) (citation omitted) (no bootstrapping occurs "when the breach of contract claim is not well-pled such that there is no breach claim on which to 'bootstrap' the fraud claim").

### D.    Promissory Estoppel

In its promissory estoppel claim, the Complaint alleges that KEB detrimentally relied on defendants' promises that: (1) KEB's "interest in the company would not be diluted below a certain level and that it would be able to recoup its initial investment after the fourth year anniversary"; and (2) the Property Manager would honor the put exercise "one year from the closing date." Compl. ¶¶ 46, 50.

> Under Delaware law, a plaintiff asserting a promissory estoppel claim
>
> must show by clear and convincing evidence that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise.

*Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000). Promissory estoppel does not apply "where a fully integrated, enforceable contract governs the promise at issue." *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 348 (Del. 2013); *see also Alltrista Plastics, LLC v. Rockline Indus., Inc.*, 2013 WL 5210255, at *9 (Del. Super. Ct. Sept. 4, 2013) ("[C]ourts must be careful that they do not apply the doctrine of promissory estoppel when there is an existing contract that governs the issue before the Court.").

The Put Option Agreement governs the promises at issue here. That contract states that KEB "shall have a dilution rate of no greater than 1.25"; that "[a]fter the fourth anniversary of its investment, [KEB] may put its interest in the Company" to the Property Manager; and that "[t]he Property Manager can delay the closing for up to one year." Compl. ¶ 23 (quoting Put Option Agreement). These provisions address the same subjects as the promises on which the

16

promissory estoppel claim is based. Accordingly, "a claim based on promissory estoppel cannot lie." *SIGA Techs. Inc.*, 67 A.3d at 348.[9]

KEB counters that its promissory estoppel claim is properly pled in the alternative because the scope of the Put Option Agreement is disputed. Opp'n at 16. "[A] party asserting a breach of contract claim may plead promissory estoppel in the alternative" where "there is a genuine dispute about whether a contract was formed." *Frank Invs. Ranson, LLC v. Ranson Gateway, LLC*, 2016 WL 769996, at *11 n.99 (Del. Ch. Feb. 26, 2016); *see also James v. United Med. LLC*, 2017 WL 1224513, at *7–8 (Del. Super. Ct. Mar. 31, 2017) (permitting plaintiff to plead promissory estoppel in the alternative where defendants argued agreement was not "an enforceable contract"). But the parties do not contend that the Put Option Agreement is invalid or unenforceable. As alleged, the parties instead disagree whether, under that agreement, the Property Manager's one-year delay is to be measured from the date of closing or the put exercise. *See, e.g.*, Compl. ¶¶ 31, 41. That dispute concerns contract interpretation, not formation. The Complaint's attempt to plead promissory estoppel in the alternative thus fails.

Because the Complaint does not adequately plead promissory estoppel, the Court dismisses that claim as to all defendants. *See, e.g.*, *AI Litig. Fin. Assocs., Inc. v. Fortuna-Insights, Inc.*, 2025 WL 2556542, at *7 (Del. Super. Ct. Sept. 4, 2025) (dismissing promissory estoppel claim where "[t]he only promise alleged" was "explicitly based" on written agreement); *TrueBlue, Inc. v. Leeds Equity Partners IV, LP*, 2015 WL 5968726, at *5 (Del. Super. Ct.

---

[9] KEB argues that Skydell's alleged promise—that the Property Manager would honor the put "one year from the closing date"—was "not merely a restatement of the obligations contained within the Put Option Agreement" because it was made after KEB exercised the put. Opp'n at 16. The Complaint suggests otherwise. It alleges that, on December 9, 2023, Skydell stated in an email to KEB: "*In accordance with the provisions of the [Put Option Agreement]*, the Property Manager (as that term is defined in the letter) hereby elects to adjourn the closing for one year." Compl. ¶ 30 (emphasis added). This argument is thus unavailing.

Sept. 25, 2015) (same where "a fully integrated, enforceable contract govern[ed] the promise at issue" (citation omitted)); *SIGA Techs. Inc.*, 67 A.3d at 348 (similar).

### E. Breach of the Implied Covenant

The Complaint claims breach of the implied covenant of good faith and fair dealing by the Managing Members and the Property Manager. It alleges that those defendants breached by failing to respond to KEB's communications regarding its exercise of the put and its interest in the Company, and that the Managing Members breached by attempting to impair KEB's interest in the Company beyond the limit provided under the Put Option Agreement. Compl. ¶¶ 52–53.

"The implied covenant is inherent in all contracts and is used to infer contract terms 'to handle developments or contractual gaps that the asserting party pleads neither party anticipated.'" *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010)). To state a claim for breach of the implied covenant, a plaintiff "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Cantor Fitzgerald, L.P. v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998). It is "a limited and extraordinary remedy," which "does not apply when the contract addresses the conduct at issue." *Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (citation omitted).

The Complaint fails to state a claim for breach of the implied covenant. First, to the extent that the implied covenant claim is premised on defendants' failure to provide KEB with information it requested, it is improper because the LLC Agreement addresses the conduct at issue. Specifically, that agreement provides that "[a]ny holder of a Beneficial Interest"—*i.e.*, any regular member of the Company, such as KEB—has the right to "examine any information it

18

may reasonably request" and "discuss the affairs, finances and accounts of the Company with the Managing Members . . . all at such reasonable times and as often as such holder of a Beneficial Interest or any agents or representatives of such holder of Beneficial Interest . . . may reasonably request." LLC Agreement § 8.1(c). In arguing that "the Put Option Agreement is silent as to the Managing Members' obligations to respond to [KEB's] inquiries or to keep it apprised of the status of its investment," Opp'n at 20, KEB overlooks the provision in the LLC Agreement that directly addresses these topics.

Second, even assuming that the allegations pled breach of an implied contractual obligation, the Complaint does not adequately allege that such conduct resulted in "damage" to KEB. It states only that KEB "has suffered" as a "direct and proximate result" of the breaches. Compl. ¶ 54. The Complaint does not allege, for example, how the Managing Members' mere "attempt[s] to impair [KEB's] interest" in the Company, *id.* ¶ 53, prevented KEB "from receiving the fruits of [its] bargain," *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (citation omitted). The implied covenant claim therefore also fails because "[t]he complaint fails to plead . . . an injury except in the most conclusory way." *Kuroda*, 971 A.2d at 889.

For these reasons, the Court dismisses the breach of implied covenant claim as to all defendants. *See, e.g.*, *MHS Cap. LLC v. Goggin*, 2018 WL 2149718, at *12 (Del. Ch. May 10, 2018) (dismissing implied covenant claim where it "rest[ed] entirely on conduct explicitly addressed" in parties' contract); *Kuroda*, 971 A.2d at 888 (same where "express terms of the contract will control such a claim"); *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 896 (Del. 2015) (superior court erred in finding breach of implied covenant where "the express terms of the contract governed").

F.      **Breach of Fiduciary Duty**

The Complaint claims breach of the implied covenant of good faith and fair dealing by the Managing Members.  It alleges that, as fiduciaries of the regular members, the Managing Members owed duties of loyalty and care, which they breached in failing to honor KEB's put option exercise and ignoring KEB's inquiries concerning its interest in the Company after the capital calls.  Compl. ¶¶ 56–57.

"A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).  To state a claim for breach of the duty of loyalty, the complaint must allege defendants "were interested in the transaction, lacked independence, or acted in bad faith," *Morrison v. Berry*, 2019 WL 7369431, at *13 (Del. Ch. Dec. 31, 2019), such as by "knowingly and completely fail[ing] to undertake their responsibilities," *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243–44 (Del. 2009).  A claim of breach of the duty of care, in turn, must plausibly allege the defendant "acted with gross negligence," which "involves more than simple carelessness," *Morrison*, 2019 WL 7369431, at *22.  It requires "conduct that constitutes reckless indifference or actions that are without the bounds of reason." *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008).

There is no dispute that the Managing Members owed KEB a fiduciary duty.  The LLC Agreement expressly stated as much. *See* LLC Agreement § 5.4(c) ("[T]he Managing Members shall be under a fiduciary duty to conduct the business and affairs of the Company and cause and procure the business and affairs of each Company Subsidiary to be conducted in the best interests of the Company and its Members . . . .").  The question is thus whether the alleged

20

breaches—*i.e.*, the Managing Members' failure to honor KEB's put option exercise and respond to its inquiries regarding its interest in the Company—rise to the level of bad faith or gross negligence. They do not.[10]

The Complaint's alleged breach of the duty of loyalty fails for the same reason as the breach of contract claim against the Managing Members: the Complaint does not plausibly allege that the Put Option Agreement binds the Managing Members in their personal capacities or imposes obligations on them directly. Under that agreement, it is the Property Manager—not the Managing Members—who has a duty to honor KEB's exercise of the put. Accordingly, the Complaint has not plausibly alleged that the Managing Members had responsibilities related to the put option that they "knowingly and completely failed to undertake." *Lyondell Chem. Co.*, 970 A.2d at 243–44.[11]

The Complaint also fails to plausibly allege a breach of the duty of care, which it bases on the Managing Members' failure to respond to KEB's inquiries regarding its interest in the Company. This allegation may describe simple negligence, but it does not describe conduct "without the bounds of reason." *McPadden*, 964 A.2d at 1274. And, although the Complaint suggests that the Managing Members ignored KEB's "repeated inquiries," Compl. ¶ 57, it alleges

---

[10] Defendants argue for dismissal of the breach of fiduciary duty claim against the Managing Members because it duplicates the breach of contract claim. MTD at 23. Because the Court dismisses the breach of contract claim against the Managing Members, this argument is moot.

[11] The Complaint also does not plausibly allege that the Managing Members had any fiduciary duty to ensure the Property Manager complied with its obligations under the Put Option Agreement. The LLC Agreement states that the Managing Members have a duty to "cause and procure the business and affairs of each Company Subsidiary to be conducted in the best interests of the Company and its Members." LLC Agreement § 5.4(c). However, "Company Subsidiary" is defined as "Mezz and South Wacker Owner, and any other Person which may at any time be a direct or indirect subsidiary of the Company." *Id.* § 1.10. Because the Property Manager is Jones Lang LaSalle, an independent entity and not a subsidiary of the Company, the Managing Members' duties under this provision do not encompass oversight of the Property Manager.

only one communication—sent by KEB to Skydell and Karasick on October 10, 2023—where KEB so inquired, *id.* ¶ 28. This purported breach is inadequately pled.

The Court therefore dismisses the breach of fiduciary duty claim against the Managing Members. *See, e.g., Unisuper Ltd. v. News Corp.*, 2005 WL 3529317, at *9–10 (Del. Ch. Dec. 20, 2005) (dismissing breach of fiduciary duty claim where complaint was "bereft of any facts" supporting "a violation of either the duty of loyalty or the duty of care"); *Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) (affirming dismissal of breach of fiduciary duty claim because "[c]onclusory allegations . . . are insufficient to state a claim that [defendants] acted in bad faith, thereby breaching their duty of loyalty").

## CONCLUSION

For the reasons stated above, the Court grants the motion to dismiss. One claim survives: for breach of contract against the Property Manager, against which defendants did not move.

The Clerk of Court is respectfully directed to terminate the motion pending at docket 35. By separate order, the Court will schedule an initial conference on the surviving claim.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: December 22, 2025
        New York, New York

22